UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | DOCKET NO.: 21-CR-10342-PBS |
| ) | |
| STEVE WAITHE ) | |
| ) | |

DEFENDANT'S SENTENCING MEMORANDUM

Steve Waithe, a former All-American track star with a bright future, comes before this Court to be sentenced for his criminal behavior in stealing, fraudulently obtaining, and using the private photographs of many young women. He has accepted full responsibility for these offenses, and he accepts that part of the punishment must be a sentence of incarceration. He feels great shame for his actions, which have garnered national publicity, and his humbled by the experience of going from a highly revered athlete to felon/inmate. The defense submits that a sentence of the low-end of the sentencing guideline range, here 27 to 33 months, followed by three years of supervision by probation with special conditions and a community service requirement, properly balances the need to punish Mr. Waithe and to reflect the scope and seriousness of his conduct, against mitigating factors set forth below. Such a sentence is "sufficient, but not greater than necessary" to fulfill the needs of sentencing when all of the sentencing factors set forth in 18 U.S.C. §3553(a) are considered.

I.    *Mr. Waithe's History and Characteristics and the Nature and Circumstances of the Offense*

Steve Waithe is the youngest of four children in his family. His parents are immigrants from Trinidad. Mr. Waithe's two older brothers were born in Trinidad. His family immigrated to the United States and settled in Maryland, where Mr. Waithe was born and raised. Mr. Waithe's

parents are not college educated, but they worked hard and valued education very much. Mr. Waithe's father has worked for Walmart for over 20 years. His mother did work for TJ Maxx but now is struggling with M.S. and is unable to work. She was diagnosed with M.S. right around the time of Mr. Waithe's arrest. His parents have written a letter of support, attached as Exhibit A, that demonstrates not only their support of their son, but also their own character. Mr. Waithe has very close relationships with his parents and siblings. They are all shocked at his conduct, and in no way condone it. However, they remain steadfastly supportive of him and want to see him get help.

Mr. Waithe's three older siblings were all high achieving student-athletes. His brother Stann went to the University of Michigan and starred in the 400-meter race. He competed for Trinidad in the 2008 Olympics. He now works in Chicago, where he lives with his wife and children. His brother Stevann also was a sprinter and hurdler at the University of Michigan. He is now a social worker at a VA Hospital in Baltimore. His sister Anneve, with whom Mr. Waithe is the closest, ran track at Wake Forest and then went on to law school. She currently lives in Baltimore and is working for a non-profit while studying for the bar. This case, and the publicity it has garnered, has brought much pain to the Waithe family.

Mr. Waithe tried to follow in his siblings' footsteps. Like his siblings, he was a track star, although his specialty was the triple jump and the long jump. After receiving a scholarship at Clemson University his senior year in high school, his grades dropped and the scholarship was rescinded. He went to Shippenberg University for two years and did well enough to receive a full scholarship to Penn State. At Penn State, he excelled at track and was an All-American athlete. He often spent his summers in Trinidad, where he competed for their national team.

With this background, it is hard to imagine what led Mr. Waithe to commit these crimes. After college, Mr. Waithe pursued a career in coaching. Track had been his world for so long, he could not imagine doing anything else. But he was no longer the star; instead, he was an assistant coach making a small amount of money. He felt isolated and fell into a depression. He lost his status, a part of his identity, and felt as if he had lost his purpose. He started spending more time online viewing pornography. His interest and obsession with self-produced pornography grew, and in his depressed state, he crossed many boundaries in stealing images from young women he coached. He continued the behavior even after being fired from Northeastern, and came up with other ways to obtain additional images, such as creating fake Instagram accounts to try to trick the women whose images he had already stolen into sending more images (none of them did). He created a fictious "body development study," and, using an online alias, tried to convince former female athletes to send him nude or partially nude photographs. Most recipients ignored the emails, but some did not and sent him photographs. Finally, he also found a website called LeakedBB where users share "leaked" pornographic images with each other, and where he elicited the assistance of a self-professed hacker to steal private images from women's Snapchat accounts. With the images he received from Victim 6's Snapchat account, he harassed Victim 6 and her boyfriend by sending them the images he had received from the hacker, threatening to "leak" the photographs if they did not respond to his messages. Intertwined with his sexual interest in this type of imagery, was a need to exert some power and control over others at a time in his life when he felt like he had been knocked off the pedestal of being an elite athlete.

      Mr. Waithe acknowledges the harm, including the ongoing harm, his actions have had on the victims of this offense. Their privacy was invaded by a person whom many of them knew and trusted. The effects of Mr. Waithe's actions have not ended with his arrest. Their anger

towards Mr. Waithe is understandable, but, in the words of Judge Woodlock, "there is not a role in sentencing for "cruelty, crudity, and vengeance," for vengeance reflects a "desire to get back." [T]hat is where our civilization started; it is not where it is supposed to end. It illustrates the importance of having a professional criminal justice system that tries to refine that vengeance into a fair, proportionate and dispassionate resolution of matters." *United States v. Catherine E. Greig*, No. 11-cr-10286-DPW, ECF No. 145, Transcript of Sentencing Hearing at 108.

II.     *Sentencing Guidelines*

While courts must *consider* the sentencing guidelines, the Supreme Court has held that the Court may not presume that the guideline sentencing range is reasonable, and Congress has *required* federal courts to impose the *least* amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). In this particular case, the guidelines are an accurate measure of culpability, taking into account Mr. Waithe's role as some victims' track coach, the number of victims, the sophistication involved in creating fake accounts, the fact that he stole personal photos, and the theft of personal information. To the extent his culpability may be understated by the fraud guidelines' reliance on monetary loss, when balanced against other mitigating factors a sentence at the low end of the guidelines, here 27 months, is justified.

The defense agrees with probation's calculation of the sentencing guidelines. The offenses that relate to Mr. Waithe's fraudulent acquisition of photographs are grouped together. Under §2B1.1, Mr. Waithe's base offense level is 7 based on the maximum punishment for the wire fraud charges. He receives a 2-point enhancement because there were more than 10 victims involved in the offense. He receives an enhancement for sophisticated means – usually a 2-point enhancement, but 3 here because his offense level is only 9 prior to reaching this enhancement in

4

the guideline. *See* USSG §1B1.1(a)(2) (instructing to "determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two *in the order listed*") (emphasis added). Another 2-point enhancement applies because Mr. Waithe was convicted of 18 U.S.C. §1030 and committed the offense to steal personal information, here personal photographs. Lastly, a 2-point role enhancement applies because Mr. Waithe was the track coach of some of his victims, which meant they trusted him enough to let him borrow their phones. The offense level for the fraud counts is thus 16.

Despite the fact that the fraud counts encompass almost all of Mr. Waithe's criminal behavior, it is the cyberstalking count, involving a single victim for a relatively short period of time, *see* PSR ¶26, that results in a higher offense level and thus drives the guideline sentencing range. Under §2A6.2, the base offense level is 18, and a 2-point enhancement for a pattern of activity applies (although a pattern of activity is inherent in the cyberstalking count to begin with).[1] After the additional 2 levels are added for abuse of position of trust, the total offense level for this group is 22.

Under grouping principles, one point is added to account for the multiple groups, bringing the offense level to 23. After a 3-point downward departure for Mr. Waithe's acceptance of responsibility, and a warranted 2-point downward departure because he is a "zero-

---

[1] The United States Sentencing Commission Guideline Manual includes one section to handle all types of stalking or domestic violence offenses at once, USSG § 2A6.2. For example, the statute at issue here covers a broad range of behavior and intentions with respect to use of electronic communications: "…with the intent to *kill, injure, harass, (or) intimidate*…another person…to engage in a course of conduct that…places that person in *reasonable fear of the death of or serious bodily injury to (the) person*….**or** causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress…" Here, Mr. Waithe's conduct was intended to "harass" and "intimidate" with the intent to "engage in a course of conduct that caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress." He never threatened violence. The Guidelines, however, do not distinguish between subsections of the statute.

5

point offender," the final offense level is 18, resulting in a guideline sentencing range of 27-33 months.

Probation has suggested, and the government will undoubtedly argue, that the Court might consider an upward departure as suggested by Application Note 21(A) to §2B1.1 because the offense level for group one "substantially understates the seriousness of the defendant's offense." To extent court thinks the 2B1.1 guideline does not accurately capture the harm inflicted on the victims in this case, the 2B1.1 guideline offense level should be the starting point for any departure, not the cyberstalking guideline offense level. *See* USSG §2B1.1, Application Note 21(A) ("There may be cases in which **the offense level determined under this guideline** substantially understates the seriousness of the offense") (emphasis added). Without the cyberstalking count, Mr. Waithe's guideline sentencing range would be 8-14 months. Put another way, to get to the same offense level that does apply in this case, i.e. 22, a 6-point enhancement for loss would have to be applied to the 2B1.1 guideline, which equates to a loss amount of more than $40,000 and up to $95,000. This loss amount is enough to account for the stolen private photographs that were the subject of the fraud counts. The guideline sentencing range in this case, driven by the one count of cyberstalking, is already substantially higher than the 2B1.1 guideline, and therefor encompasses any upward departure. There is no reason to upwardly depart any more.

The government has also argued that the Court should apply an enhancement under §3B1.1(c) because Mr. Waithe allegedly acted as an organizer, leader, manager, or supervisor in committing computer fraud. The defense agrees with probation that this enhancement does not apply here. While Mr. Waithe paid the unknown co-conspirators to hack into Snapchat accounts, not every buyer/seller relationship can be characterized as a one with an organizer/leader. The

6

co-conspirators were people who posted on the LeakedBB website about their ability to hack into Snapchat accounts prior to Mr. Waithe contacting them. *See* Indictment, ECF No. 30, ¶33. While Mr. Waithe provided the information of the accounts he wanted his co-conspirators to hack into, it was the co-conspirators who obtained access to the Snapchat accounts by sending communications to the victims purporting to be from Snapchat, and then accessing the accounts and downloading photos which were in turn sent to Mr. Waithe. The relationship between Mr. Waithe and the co-conspirators was a simple transactional one. Likewise, probation has rejected the government's suggestion that upward departures are also warranted under USSG §§5K2.9 and 5K2.21. As noted by probation, the factors set forth in those provisions of the guidelines are already accounted for in the applicable offense conduct and guideline calculation, including enhancements.

   III.   The Need to Avoid Unwarranted Sentencing Disparities

Pursuant to 18 U.S.C. § 3553(a)(6), the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." While there an insufficient number of cases with the same guideline in the JSIN database to produce any useful data, there have been similar prosecutions in other districts that serve as useful comparators:

- *United States v. Hunter Moore & Charles Evens*, 2:13-cr-00917-DMG (CDCA) – Mr. Moore ran a website that disseminated nude photographs from hacked accounts. Mr. Evens was hired by Mr. Moore to hack into email accounts to steal nude photographs that were then posted on Mr. Moore's website. The case involved hundreds of victims. Mr. Moore received a sentence of **30 months**, and Mr. Evens received a sentence of **25 months**.

- *United States v. Nicholas Faber*, 8:21-cr-00021-MAD (NDNY) – While a student at SUNY Plattsburgh, along with at least one other student, Mr. Faber accessed online accounts of college females to steal their nude photographs and videos. Mr. Faber asked others to hack into specific females' online accounts in order to steal their nude

7

photographs and videos and as a result received such materials from multiple hacked accounts. Mr. Faber was himself able to access approximately ten accounts without authorization and stole nude images from those accounts. Mr. Faber traded the stolen images he received with others. Mr. Faber also worked with another individual[2] to hack into the school email accounts of female students at their university and reset their passwords in order to steal personal information they could use to access social media accounts in order to steal more nude images. Mr. Faber was sentenced to **36 months**.

- *United States v. Justin Potts*, 6:19-cr-06034-CJS (WDNY) – Mr. Potts obtained usernames and passwords for over 100 online accounts, and then accessed those accounts to obtain personal information and nude photographs. He possessed over 1000 stolen images and the government identified approximately 65 victims. Mr. Potts was also investigated for using his phone to secretly take nude or partially nude photographs of women at tanning salons. Mr. Potts received a sentence of **three years' probation**.

- *United States v. Jared Abrahams*, 8:13-cr-00199-JVS (CDCA) – Mr. Abrahams used hacking software to access and control approximately 100-150 computers. Once he had access to these computers, he used the computer webcams to secretly take nude images of young women. He then extorted some of the young female victims by threatening to post the webcam photos if the victims did not send him more naked videos or participate in video chats with him. Those victims who did not comply did have their nude images posted on social media sites. Mr. Abrahams received a sentence of **18 months**.

- *United States v. Edward Majerczyk*, 1:16-cr-00550-CPK (NDIL) – Mr. Majerczyk engaged in a sophisticated phishing scheme in which he sent emails from fake email addresses in order to obtain victims username and passwords. He used this information to access the victims personal data as well as nude photographs and videos. There were over 300 victims, including many celebrities. Mr. Majerczyk received a sentence of **9 months**.

- *United States v. Daniel Reyes Ruiz*, 5:19-cr-00159-EJD (NDCA) – Mr. Reyes was an engineer for Yahoo who used his position to hack into thousands of accounts to steal personal information, financial information, and nude images. He downloaded approximately 2 terabytes of data and possessed thousands of private images and videos. He received a sentence of **5 years' probation**.

- *United States v. Brandon Boyer*, 23-cr-00232-MEM (MDPA) – Mr. Boyer hacked Snapchat accounts of dozens of women in order to steal their nude photographs and then sold images to others. Boyer did this for over two years and made between $50,000 - $60,000 selling the stolen images. Mr. Boyer was sentenced to **18 months**' imprisonment followed by two years of supervised release.

---

[2] This other individual, Michael Fish, began the hacking scheme and had accessed many more accounts than Mr. Faber. Mr. Fish was also found to possess child pornography, and received an enhancement for obstruction of justice for submitting fake character letters to the court. Accordingly, Mr. Fish received a much higher sentence of 111 months.

8

- *United States v. Bryan Andrew Wilson*, 22-cr-00048-BJB-RSE (WDKY) – former Louisville police officer, Bryan Andrew Wilson, was simultaneously prosecuted for being part of a conspiracy with other officers to assault civilians while on duty by throwing drinks at random people on the street, while also being prosecuted for stalking and extorting young women online. Mr. Wilson used his law enforcement access to databases to acquire information about his victims, and then gave that information to hackers who would gain access to Snapchat accounts, stealing sexually explicit photographs and videos. Mr. Wilson would then contact the victims and extort them, threatening to publish the stolen images unless they provided him with additional explicit photos and videos. Mr. Wilson was sentenced to **30 months**.

- *United States v. Patrick Marquez Black*, EDNC – Mr. Black was sentenced to **13 months**' imprisonment after pleading guilty to wire fraud and computer fraud. He hacked into the Snapchat account of an active female member of the military and stole her nude images and videos, which he then sold for money and distributed. He also used the victim's account to gain access to additional accounts, stealing nude images and videos of other victims as well, and to extort money from her friends. His conduct spanned the course of three years.

These cases provide context for the Court's sentencing in this case. Of course every case is different, but this case is not the first criminal prosecution involving the theft, and even dissemination, of women's private photos. The sentences in the cases described above support the proposition that the sentence requested by the defense is one that would avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6).

IV.   Other §3553(a) Factors

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances; or, in the words of 18 U.S.C. § 3553(a), establishing what sentence is "sufficient but not greater than necessary." "Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation,

9

and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

      Mr. Waithe's acceptance of responsibility goes beyond simply pleading guilty and admitting that he committed these crimes. Since his arrest, he has spent countless hours reflecting on his conduct, trying to understand what led him to commit these offenses and what changes he will make in his life going forward so he doesn't commit any similar crimes in the future. Most importantly, he has reflected on the harm he caused to young women who are the victims of the offense. He has thought about his own sister in relation to the offense, and how she would be affected if she had been similarly victimized. He has educated himself on the principles of Restorative Justice, a practice focused on how to repair harms. He wrote a letter of apology to the victims, and he has agreed to the government seizure of all social media and email accounts that were used in the commission of the offense. To the extent the defense is requesting a sentence considerably lower than the one requested by the government, or even the one the victims will ask the Court to impose, this should not be taken as an attempt to minimize the offense or skirt acceptance of responsibility.

      The defense's request for a sentence of 27 months is based on careful and balanced consideration of all the §3553(a) factors. This case and the publicity it has brought will affect Mr. Waithe the rest of his life. Once a young black man with a bright future, his life will look

much different now going forward. The stigma of this case alone is a very real and significant form of punishment for Mr. Waithe.[3] He knows he will never be able to coach again, and he has resigned himself to starting a life that does not involve track and field. He knows he will have to start from scratch upon his release from prison, and that his life will be much more difficult now.

As is evident from the letter Mr. Waithe has written to the Court, attached as Exhibit B, he is determined not to reoffend. He has a plan for his future, and it looks very difference from his past. His plan not only includes employment and ideas to improve the lives of incarcerated people, but also to be home to care for his mother while his father continues to work. Mr. Waithe's time in prison has been one of reflection and growth, and it has been sufficient to deter him from reoffending. He acknowledges that he was given by a chance by the Court to comply with pretrial conditions of release and did not do so. His release was revoked, and he has remained incarcerated since then. While his arrest alone might not have been enough to deter him, a 27-month prison sentence, considering he is a first-time offender, is surely enough to deter him in the future.

Another important part of Mr. Waithe's sentence that serves to fulfill many of the §3553(a) factors is the term of supervised release that will follow his incarceration. Mr. Waithe does not object to the maximum period of three years' supervised release, nor does he object to any of the special conditions proposed by probation. They all make sense. Mr. Waithe, in an

---

[3] Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed" ); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

effort to repair the harm he has caused, also offers to complete 100 hours of community service as a condition of his supervised release. He has a lot to offer the community, and he is eager both be of service but also work towards some redemption. A lengthy period of supervision, with special conditions of supervised release, will continue to both protect the public and provide Mr. Waithe with necessary treatment in the most effective manner.

## CONCLUSION

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Steve Waithe is a young man with no prior criminal history who has paid a steep price for his crimes. He has come to realize the seriousness of the crimes he committed, and the harm he has caused, and has used his time in jail to figure out how to make necessary changes in his life. A sentence of 27 months' incarceration followed by three years of supervised release, with special conditions of supervised release, is a just sentence in this case.

Respectfully submitted,
STEVE WAITHE,
By His Attorney,

*/s/ Jane Peachy*
Jane Peachy, BBO#661394
Federal Public Defender Office
51 Sleeper St., 5th Floor
Boston, MA  02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 1, 2024.

                                                             */s/ Jane Peachy*
                                                             Jane Peachy